IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

JAN 1 2 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| DOUG SUTTON AND PRESCOTT NOTTINGHAM, On Behalf of Themselves and All Others Similarly Situated | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 00C6676 |
| ROBERT F. BERNARD, ROBERT T. CLARKSON, AND BERT B. YOUNG | ) ) ) | |
| Defendants. | ) ) ) | |

*DOCKETED*

JAN 1 3 2005

**AFFIDAVIT OF DAVID TABAK, PH.D.
AND STEPHANIE PLANCICH, PH.D.**

## I.    Scope of Analysis and Summary of Findings

National Economic Research Associates ("NERA") has been asked by counsel for defendants in this matter to review the proposed settlement of $18 million and determine whether that amount represents a fair payment to members of the class. As discussed more fully in this affidavit, our findings are as follows:

- The proposed settlement of $18 million exceeds the median predicted settlement of $12.8 million based on NERA's statistical analysis of over 400 other settlements.

130

- Any reasonable analysis of alleged damages, even assuming liability, would need to account for various factors that would work to reduce the size of the calculated alleged damages.

## II.    Qualifications

NERA was established in 1961 and now employs over 500 people in over a dozen offices worldwide. NERA provides consulting for economic matters to parties for their internal use, to parties in litigation, and to government and regulatory authorities.

Dr. Tabak is a Vice President in NERA's Securities and Financial Services practice. Dr. Tabak received Bachelors degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Masters degree and a Ph.D. in Economics from Harvard University. He has appeared as an expert in United States District Courts; state courts; bankruptcy court; and in arbitration forums including the National Association of Securities Dealers; the International Chamber of Commerce, International Court of Arbitration; and the American Arbitration Association. He has published in areas relevant to the calculation of damages in shareholder class actions; one work dealing with such calculations that Dr. Tabak co-authored was cited in *In re Gaming Lottery Sec. Litig.*, 2000 WL 193125, *1 (S.D.N.Y.2000), and has been cited again via reference to *In re Gaming Lottery* in cases such as *In Re Imperial Credit Industries, Inc. Securities Litigation*, 2003 WL 1563084 (C.D.Cal.).

Dr. Plancich is a Consultant in NERA's Securities and Financial Services Practice. Prior to joining NERA, she received a Ph.D. in Economics from the Massachusetts Institute of Technology, where she taught undergraduate courses in micro and macro economics. At NERA, among other areas, she has specialized in the economics of securities and financial markets, and has worked on the development of the of the most recent NERA Predicted Settlement model. In 2004, she co-authored the NERA publication, "Recent Trends in Securities Class Action Litigation: 2003 Early Update" with NERA Vice Presidents Dr. Elaine Buckberg and Todd Foster.

## III.   Analysis of Predicted Settlement

Over the past decade, NERA has compiled a database of historical securities class action settlements.  This information allowed us to use regression analysis (a statistical tool) to identify and quantify the major characteristics associated with settlement values.  Based on this analysis, we have developed a model that allows us to predict a likely range for the settlement value for other class action cases outside of our historical sample.  When we use this model to predict the settlement for marchFIRST, Inc., we find that the proposed settlement falls well within our projected distribution of likely settlements for cases with characteristics similar to marchFIRST, and in fact falls above the median predicted settlement level.

### A. Description of the Model

As a first step toward understanding the drivers of securities class action settlements, NERA has compiled a database of approved settlements dating back to 1991.  We identify settlements using the Securities Class Action Alert, which provides us with information on the date and size of a settlement, along with other basic characteristics of the case.  Then, we supplement this information with stock price, industry and other data.

From this larger database, we select 428 post-PSLRA settlements for which we have detailed case information.[1]  All of these cases are federal cases that settled before December 31, 2003.  Using this sample, we construct a regression model to determine which case characteristics are significantly correlated with settlement values.

We find that there are 14 variables historically correlated with settlement size.  Of these, the largest driver of settlements is our measure of "investor losses."  Investor losses is a measure that estimates the losses investors would have suffered due to the decline in the company's market value from the beginning of the class period until the final alleged corrective

---

[1]  Post-PSLRA settlements include all settlements for cases filed after the passage of the Private Securities Litigation Reform Act on December 22, 1995.

- 4 -

disclosure relative to the performance of the S&P 500 Index over the same period.[2]  While this measure of investor losses is not an unbiased proxy for actual damages – it is prone to overstate actual damages for a variety of reasons[3] – it is likely to be strongly correlated with alleged damages and thus with settlements.  For example, holding everything else constant, companies with large numbers of shares outstanding are likely to have both higher alleged damages and larger investor losses.

We find that approximately 50% of the variation in settlements can be explained by investor losses: the larger the investor losses, the larger the settlement.  Settlements do not appear to increase linearly with investor losses; instead, settlements rise by 0.4% for every 1% increase in investor losses.

Other characteristics of a case are also highly correlated with settlements, though they do not have as large an impact as investor losses.  Firms with larger market capitalization have higher settlements, holding all other variables constant.  Cases that allege damages to debt, option, or preferred stock holders have higher settlements.  If a case involves allegations of accounting fraud, an accounting restatement, or an admission of accounting irregularities, settlements are higher.  Cases with a potential Section 11 claim also have higher settlements.

If there is an accountant co-defendant or an institutional lead plaintiff on a case, settlements are higher.  Cases in the health industry have higher settlements, as do cases involving a regulatory or enforcement agency investigation or adverse finding.  Finally, if the defendant has declared bankruptcy or has a share price of less than $1 at the time of settlement, settlement values are lower.

---

[2] The calculation compares the actual stock price on each day during the class period with a hypothetical price that perfectly tracks the S&P 500 Index and on the last day of the class period equals the issuer's average stock price over the five subsequent days. For shares purchased during the class period and held to the end, loss per share equals the excess, if any, of actual purchase price over hypothetical purchase price. For shares purchased and sold during the class period, loss per share equals the excess, if any, of actual loss (i.e., actual purchase price less actual sale price) over hypothetical loss (purchase price less hypothetical sale price).

The number of shares bought on any given day during the class period and sold on any given subsequent day during the period or held to the end of the period is estimated using the single-trader (proportional decay) model.

[3] For example, the model used to calculate investor losses does not adjust for institutional- and insider-held shares that would not be damaged. See notes 2 and 4 for more detail.

We are able to explain approximately 64% of the variation in historical settlements with this model. Note that, presumably, some of the remaining variation in historical settlements is generated by subjective factors we are not able to systematically incorporate into our analysis, such as the individual merits of these cases.

Thus, although it cannot explain all of the variation in settlements, our regression analysis gives us good insight into the primary determinants of settlement value. Using this model, then, we are able to predict expected out-of-sample settlements for other securities class action cases based on the investor losses and other case-specific characteristics of these claims. Our model also allows us to estimate a distribution of predicted settlement values for any specific securities class action case, including that of marchFIRST.

## B. Predicting the marchFIRST, Inc. Settlement

As mentioned above, the primary driver of expected settlements is investor losses. For marchFIRST, investor losses are measured at $3.2 billion over the alleged class period from March 23, 2000 through November 20, 2000.[4] On the day after the class period, the market capitalization of the firm was $236 million.

In addition, the allegations against marchFIRST involved accounting fraud. The existence of these allegations increases our predicted settlement by 16.4%. marchFIRST also filed for bankruptcy in 2001, a factor that we find is associated with lower settlement values. We predict that marchFIRST's settlement will be 27.6% lower due to its Chapter 11 filing.

Using these characteristics of the marchFIRST case, we can construct a distribution of the expected settlement for the Company. (See Exhibit 1.) We estimate that median settlement in this case is $12.8 million dollars, meaning that we predict that 50% of settlements for cases

---

[4] Note that, as discussed above, the investor losses figure of $3.2 billion likely exceeds the maximum amount that investors could possibly have lost in marchFIRST's stock. The measure of investor losses used in the NERA study includes both the declines in marchFIRST's price (whether or not they were associated with any alleged disclosures), as well as gains that would have been earned in an alternative investment in the S&P 500. In addition, this calculation does not take into account institutional shares that did not trade, short interest, or insider holdings. This figure, then, is in no way intended as a measure of alleged damages in this case. We chose to use this measure of investor losses to predict settlements because it was simple to calculate for a large sample of firms and because we found a statistically significant correlation historically between this measure and observed settlements.

with similar objective, quantifiable characteristics to marchFIRST will lie above this value, and 50% will be below it.

The proposed settlement in this case of $18 million falls well within the range predicted by our model. This can be illustrated by dividing up the predicted settlements into quintiles. The marchFIRST proposed settlement of $18 million lies within the second quintile of the distribution, which contains settlements from the 20th to the 40th percentile, where the top percentile has the largest predicted settlement and the 100th percentile the smallest. More specifically, the marchFIRST predicted settlement lies at the 36th percentile, meaning that if we had a large number of cases with similar objective characteristics, we would predict that 36 percent of those cases would settle for amounts above $18 million and 64% would settle for amounts less than $18 million. Put differently, the $18 million settlement is larger than what plaintiffs should expect to receive nearly two-thirds of the time once one controls for the objective characteristics of this case.

The $18 million proposed settlement is also over 40% higher than the median expected settlement, or the amount at which half the settlements would be expected to be larger and half smaller, if we had a large number of cases with the same objective characteristics as the marchFIRST class action.

Thus, based on our analysis of historical settlements with similar characteristics to marchFIRST, we conclude that the proposed settlement of $18.0 million is a fair and reasonable outcome. We predict that approximately 64% of bankrupt companies with similar investor losses, market capitalization and accounting fraud allegations would have lower settlements than the current proposal.

## IV.    Analysis of Risks to Plaintiffs of A Large Damage Claim

We have also reviewed the Complaint and various additional documents relevant to the calculation of damages in this matter. While plaintiffs could come up with a coherent damages

theory, there are a number of areas in which any such theory that yielded a large damage figure could come under attack. Among these are the following:

- **MarchFIRST's peer group also performed poorly.** While marchFIRST's stock price declined by 93% from March 23, 2000 to November 20, 2000, the members of the peer group listed in the August 21, 2000 analyst report by A.G. Edwards had stock price declines ranging from 53% to 96% over the same time period, thereby putting marchFIRST's price decline within the range experienced by its peers.

- **Not all of the reasons for the revenue shortfall should be counted as part of damages.** For example, a Chase H&Q analyst report dated October 25, 2000 reports five causes for the revenue shortfall announced that day. Two of these (increased A/R reserves and A/R reserves attributed to US Web clients) are arguably a source of damages, while three (a weak Euro, the closure of two offices, and conservative revenue recognition) are not tied to the allegations in this case.

- **The Complaint's allegations about growth in accounts receivables does not recognize that the relevant facts were disclosed to the market.** For example, in ¶45, the Complaint notes that "during the second and third quarters of 2000, defendants knew that the Company's accounts receivable balance was growing at an unacceptable rate…" However, the market was informed about the first, second, and third quarter accounts receivables shortly after each quarter ended. Thus, the market could calculate the relevant growth rates from quarter to quarter and could make its own determination as to the likely effects of those disclosed changes in accounts receivables, given then-current market and industry conditions. To the extent that marchFIRST had difficulty collecting on receivables during this time period, that information was available to the market in the form of earnings announcements disclosing the actual level of receivables each quarter.

While it would be impossible to provide a figure for the likely damages without a more thorough analysis, the points above are illustrations of the difficulties that plaintiffs would face in presenting a large damage estimate. Therefore, plaintiffs face a significant risk that any large damage estimate would have to be modified to account for points such as those above, which would in turn reduce their expected gains from proceeding to trial.

## V.     Conclusion

For the reasons cited above, we conclude that the proposed $18 million settlement is fair to plaintiffs in this matter. Most importantly, the proposed $18 million settlement exceeds the median settlement based on NERA's statistical analysis of quantifiable factors in over 400 other recent shareholder class actions. Beyond this, there are various reasons, some of which are discussed above, why plaintiffs could have difficulty supporting a large damage claim.

| | |
|---|---|
| 1/11/05 | David Tabak |
| Date | David Tabak |
| 1/11/05 | Stephanie Plancich |
| Date | Stephanie Plancich |

Before me Cake this 11th day of
January 2005.

Gretchen P. Polk.

**GRETCHEN P. POLK**
**Notary Public, State of New York**
**No. 5003086**
**Qualified in Westchester County**
**Commission Expires October 13, 2006**



**Exhibit 1**
**marchFIRST, Inc.**
**Distribution of Predicted Settlement Values for a Case with marchFIRST, Inc.–Specific Data**
**March 23, 2000 through November 20, 2000 Alleged Class Period**

**Exhibit 1**
**Historical Settlement Comparison for**
**marchFIRST, Inc. Securities Class Action Suit**
**With Alleged Class Period March 23, 2000 through November 20, 2000**
**Based on Post-Reform Act Securities Class Action Suits Settled through December 31, 2003**

Multiple regression is used to explain settlement value across 428 historical cases as a function of:
- a statistical proxy for investor losses relative to the S&P 500, in 2003 dollars
- the market capitalization the day after the class period, in 2003 dollars
- whether debt traders are allegedly damaged
- whether preferred stock traders are allegedly damaged
- whether option traders are allegedly damaged
- whether the case involves allegations of accounting fraud
- whether the company admitted to accounting irregularities
- whether the company restated its financials
- whether there is an accountant codefendant
- whether the case involves a potential Section 11 claim
- whether the case includes an institutional lead plaintiff
- operates in the health industry
- involves a regulatory or enforcement agency investigation or adverse finding
- whether defendant filed for bankruptcy and/or whether price at settlement date is less than $1

The following case-specific facts are used in predicting a settlement range in this case:
- estimated investor losses    $3,219,955,868
- market capitalization the day after the class period   $235,914,063
- does not allege damages to debt traders
- does not allege damages to preferred stock traders
- does not allege damages to option traders
- alleges accounting fraud
- does not involve admitted accounting irregularities
- does not include a financial restatement
- does not include an accounting codefendant
- does not involve a potential Section 11 claim
- does not have an institutional lead plaintiff
- does not operate in the health industry
- does not involve a regulatory or enforcement agency investigation or adverse finding
- defendant filed for bankruptcy or price at settlement date is less than $1

---

Predicted settlement for cases with these characteristics:
Median settlement in 2004 dollars: $12,771,500.

---

This analysis does not control for the following factors:
- strength of plaintiffs' allegations;
- relative ability of plaintiff and defense counsel;
- rulings already handed down; and
- amount and structure of insurance coverage.
If these factors favor plaintiffs (defendants) more than in the "average" case, we would expect the settlement
to be higher (lower) than otherwise.

## <u>CERTIFICATE OF SERVICE</u>

I, Kathryn C. Newman, certify that I caused a copy of AFFIDAVIT OF DAVID

TABAK, PH.D. AND STEPHANIE PLANCICH, PH.D. to be served upon the following

person(s) by U.S. Mail on this 12th day of January, 2005:

Marvin A. Miller
Matthew E. Van Tine
Miller Faucher and Cafferty LLP
30 N. LaSalle St.
Suite 3200
Chicago, IL 60602

David J. Bershad
Brad N. Friedman
Joshua H. Vinik
Bruce D. Bernstein
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
49th floor
New York, NY 10119-0165

Wendi E. Sloane
Barack Ferrazzano Kirschbaum
  Perlman & Nagelberg
333 W. Wacker Dr.
Suite 2700
Chicago, IL 60606

N. Neville Reed
Mayer Brown Rowe & Maw
190 S. LaSalle St.
Chicago, IL 60603

Michael K. Desmond
Figliulo & Silverman, P.C.
10 S. LaSalle St.
Suite 3600
Chicago, IL 60603

Gus A. Paloian
William J. Factor
Seyfarth Shaw
55 E. Monroe St.
Suite 4200
Chicago, IL 60603

Robert Schaberg
Shartsis, Friese & Ginsburg LLP
One Maritime Plaza
18th floor
San Francisco, CA 94111

Robert L. Reifenberg
James O. Nolan
Clausen Miller PC
10 S. LaSalle St.
Suite 1600
Chicago, IL 60603

Bradley P. Nelson
Eric F. Rinehart
Schopf & Weiss
312 W. Randolph St., Suite 300
Chicago, IL 60606

Harry J. Arnold, Jr.
D'Amato & Lynch
70 Pine St.
New York, NY 10270

Mary Jane Edelstein Fait

Fred Taylor Isquith

DM_US\8086661.v1

Kelly J.B. Elvin
Adam J. Levitt
Wolf Haldenstein Adler Freeman &
  Herz, LLC
 656 W. Randolph St.
Suite 500W
Chicago, IL  60661

Corey D. Holzer
Holzer & Holzer
6135 Barfield Rd.
Suite 102
Atlanta, GA  30328

Kenneth A. Wexler
Edward A. Wallace
The Wexler Firm
One N. LaSalle St.
Suite 2000
Chicago, IL  60602

Nadeem Faruqi
Faruqi & Faruqi, LLP
320 E. 39th St.
New York, NY  10016

Marc A. Topaz
Schiffrin & Barroway, LLP
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004

James E. Tullman
Weiss & Yourman
551 Fifth Ave.
Suite 1600
New York, NY  10176

Gregory M. Nespole
Wolf Haldenstein Adler Freeman &
  Herz, LLC
270 Madison Ave.
Ninth floor
New York, NY  10016

Steven J. Toll
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Ave.
Suite 500
Washington, DC  20005

Mark C. Gardy
Abbey, Gardy & Squitieri, LLP
212 E. 39th St.
New York, NY  10016

Robert M. Roseman
Spector, Roseman & Kodroff
1818 Market St.
Suite 2500
Philadelphia, PA  19103

Paul J. Geller
Geller Rudman, LLP
One Boca Plaza
2255 Glades Rd.
Suite 421A
Boca Raton, FL  33431

Jules Brody
Stull Stull & Brody
6 E. 45th St.
New York, NY  10017

Marc S. Henzel
Law Offices of Marc S. Henzel

Deborah R. Gross
Law Office of Bernard M. Gross, P.C.

273 Montgomery Ave.
Suite 202
Bala Cynwyd, PA  19004

Sherrie R. Savet
Michael T. Fantini
Berger & Montague, P.C.
1622 Locust St.
Philadelphia, PA  19103

Arthur N. Bailey & Associates
111 W. 2nd St.
Suite 4500
Jamestown, NY  14701

1515 Locust St.
2nd floor
Philadelphia, PA 19102

Roberta D. Liebenberg
Fine Kaplan & Black
1845 Walnut St.
23rd floor
Philadelphia, PA  19103

Michael I. Behn
Futterman & Howard, Chtd.
122 S. Michigan Ave.
Suite 1850
Chicago, IL  60603

_Kathryn Newman_
Kathryn C. Newman